Filed 2/24/21  P. v. Cleveland CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B301468 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA094785-04) |
| v. | |
| LYNETTE CLEVELAND, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Edmund Wilcox Clarke, Jr., Judge.  Affirmed in part and remanded with directions.

Jennifer A. Gambale, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Stephanie H. Chow, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

Lynette Cleveland appeals from a judgment which sentences her to state prison for her participation in the torture, kidnapping, false imprisonment, and assault of Ashleigh Wells over five days in August 2016. At trial, Cleveland asserted she participated in the crimes because she feared reprisal from her codefendants and others if she did not. On appeal, she contends the trial court prejudicially erred when it refused to instruct the jury on duress, to sever her trial from that of her codefendants, and to stay the sentences for three counts under Penal Code section 654.[1] She also contends there was insufficient evidence to show she committed the crime of torture. Her arguments lack merit. However, we find the trial court imposed an unauthorized sentence and remand for the limited purpose of correcting that error. We otherwise affirm the judgment.

## FACTS

Cleveland met Wells and Shanavian "Shay" Liddell in March 2016 at Timothy Thomas's apartment. Liddell and Wells both knew Thomas, a drug dealer with gang ties. At the time, Cleveland was 19 years old and Wells was 30. Thomas and Liddell were also much older than Cleveland. Cleveland, Wells, and Liddell quickly became close friends and saw one another almost every day. Cleveland confided to Wells that she was living with her aunt, who "pimped" her out in exchange for drugs or money. Wells attempted to help Cleveland, allowing her to move in with her in June or July of 2016.

On August 20, 2016, Liddell and Cleveland returned from a barbecue to Thomas's apartment on West Boulevard. They were robbed at gunpoint by three young black men. Each robber held

---

[1]  All undesignated section references are to the Penal Code unless otherwise specified.

2

a handgun and demanded drugs and money. They took Liddell's and Cleveland's identification cards and wallets. Liddell believed they were Crip gang members because they wore blue rags over their faces and used gang slang. As they left, Liddell heard them say, "This is bullshit. She lied . . . There's not shit in here."

Liddell immediately drove with Cleveland to speak with Thomas. Before she had time to tell him about the robbery, a car pulled up behind her. The same three men jumped out and began to shoot at them. Thomas fled with two of the men in pursuit. Liddell, whose car was boxed in by the robbers' car, rammed their car and the car in front to get away. The robbers followed.

The robbers stopped their pursuit when the police arrived. Liddell did not tell the officers about the earlier robbery because she was afraid they would discover that drugs were used and sold at the West Boulevard apartment. After speaking with the police, Liddell drove Cleveland and Thomas to Thomas's home in Hemet, where they stayed until August 24, 2016. While in Hemet, Liddell called Wells, suggesting they meet soon at a motel room to hang out. Wells agreed.

*Day 1: August 24*

Liddell arranged for her cousin, Steve Arnold, to drive Wells to Gardena, where Arnold had rented a motel room. Cleveland and Liddell met Wells and Arnold at a CVS drugstore near the motel.

The women walked to the motel room and began to socialize and smoke marijuana. They returned to CVS for snacks. Later that night, they decided to go back to CVS a third time before it closed. As they were preparing to leave the room, Wells was unable to locate her phone, though she knew it was in

3

the motel room because it was wirelessly streaming music to a speaker in the room.  Cleveland and Liddell convinced her to leave without it.

On the way to CVS, Arnold called, and they instead drove to a liquor store for cigarettes and tequila.  Arnold joined them in the motel room, where they drank, used cocaine, and smoked marijuana together.

Suddenly, Liddell's demeanor changed.  She locked the door and began to pull the curtains, declaring "I'm only going to ask you this one time about what happened on West."  She accused Wells of setting up the robbery, explaining that a mutual friend named Dominique Davis had implicated Wells.  Davis and Wells had only recently reconciled after a longstanding feud.  When Wells expressed confusion, Liddell told Wells what happened.

Wells denied any involvement in the robbery.  She stated she had just dropped Davis off at the bus station that morning and Davis had given her no indication anything was wrong.  Liddell ordered Arnold, who was approximately six feet tall and 200 pounds, to block the door.  She threatened that her "cousins" wanted to hurt Wells in retaliation for the robbery.  Liddell also pulled a handgun out of the nightstand by the bed, held it for a few seconds while looking at Wells, and then replaced it in the nightstand.

Liddell brought out duct tape, latex gloves, and a hammer.  She taped Wells's hands and legs together.  She did the same to Cleveland, explaining she suspected Cleveland because she lived with Wells.  Cleveland denied any knowledge of the robbery.

During her interrogation, Liddell struck Wells's knees three times and Cleveland's knees twice.  Both continued to deny any knowledge about the robbery.  Liddell also used Wells's

phone, which she apparently had hidden earlier, to call Davis, who did not answer. Liddell freed Cleveland sometime after the initial questioning, stating she believed Cleveland had nothing to do with the robbery. Liddell, Cleveland, and Arnold slept in the bed while Wells slept on a chair, still bound with duct tape.

*Day 2: August 25*

Cleveland was left to watch Wells while Liddell and Arnold paid for another night at the motel and further investigated the robbery. Cleveland did not untie Wells, leave the room, or call for help while they were gone. Wells remained bound most of the day, though she was untied to use the restroom and eat a meal. Wells slept on the floor that night.

*Day 3: August 26*

The following morning, the group left the motel. Wells's restraints were cut, she changed her clothes, and Arnold drove them to Liddell's brother's house to retrieve Liddell's car keys. Wells sat in the back seat of the car with Cleveland. As they approached her brother's house, Liddell ordered Wells to duck down in the seat so he would not see her. They stopped at the liquor store for cigarettes and the grocery store for food. At no time was Wells left alone.

Arnold also drove them to the Los Angeles Police Department Southwest Station because Liddell needed to speak with the detectives investigating the shooting incident. Arnold parked at a restaurant across the street from the police station. He gave Wells permission to use the restroom and Cleveland accompanied her. Wells passed a bystander walking to the restroom, but she did not ask for help.

Wells did not try to escape or otherwise seek help because she hoped to defuse the situation with her friends and did not want to make a scene or involve the police. Wells also hoped to speak to Thomas and straighten out what she considered a misunderstanding with him. Although Wells feared for her safety, she did not, at that time, "know that there was a real reason to run away."

They all returned to Thomas's apartment on West Boulevard. Liddell and Cleveland bound Wells's wrists and ankles. She was told to remain in the second floor bedroom when Thomas arrived. After he left, Liddell removed Wells's restraints and allowed her to take a shower and eat.

After dinner, Liddell began to ask Wells about the robbery. She was suspicious that no one had answered the calls she made from Wells's phone or appeared to be looking for Wells. She said, "They must know," accusing Wells of lying. She and Cleveland bound Wells with extension cords, attaching the cords to a pole in the center of the living room. Wells overheard Liddell tell Arnold, "I still got that," which Wells understood to be the gun she had seen in the motel room.

Liddell continued to question Wells about the robbery. She used an electric cattle prod on Wells several times, causing her "excruciating" pain. Wells urinated on herself and screamed for Liddell to stop. Eventually, Arnold yelled from another room, "That's enough." Liddell stopped, but told Wells that she "better hope" Liddell fell asleep before she decided to interrogate Wells further. Liddell appeared angrier than when she hit Wells with the hammer at the motel. Wells remained tied to the pole the entire night.

*Day 4: August 27*

The next morning, Davis called Wells's phone. Liddell became even more suspicious when she heard Davis ask Wells unusual questions about Cleveland over the speakerphone. After the call ended, Liddell put on a pair of thick black gloves and punched Wells twice in the left eye. Wells, still tied to the pole, began to bleed profusely.

Shortly afterwards, Wells was unbound, cleaned up, and taken to the dining area because Lewis had arrived with her children. Liddell spoke with Lewis in the bedroom and she left soon after. Liddell then told Wells to call her mother and son to say goodbye. Crying, Wells told her mother and son that she loved them. Her mother asked what was wrong, but Wells said she was just tired. Liddell and Cleveland tied Wells up again and led her to the bedroom. Wells heard voices in the other room, including new voices she did not recognize.

After approximately two hours, Liddell and Arnold moved Wells to Arnold's car, tying her bound legs and hands to the headrests. As she was escorted out of the apartment, she saw Thomas in the living room. Wells attempted to escape while she was in the car. She managed to free a hand, but set off the car alarm, which someone remotely deactivated. Arnold and Liddell untied Wells from the headrests, but left her arms and legs bound. They drove to a drive-through smoke shop. When they returned to the apartment, Cleveland, Lewis, and Thomas's son, Marquis, were there.

Wells was again tied to the pole. Marquis and Liddell questioned why Wells set up the robbery and attempted murder. Wells continued to proclaim her innocence. After Liddell punched Wells, she looked at Cleveland and asked, "Who wants

to go?" and "Do you want to go?  Do you want some of this?"
Cleveland put on her tennis shoes and began to punch and kick
Wells.

After a few minutes, Liddell asked Lewis if she thought she
could "bust" Wells's other eye. Lewis said yes, and punched
Wells's right eye twice.  Liddell goaded Lewis, "You can do better
than that," causing Lewis to hit Wells with more force.  Liddell
also hit Wells in the right eye.  Wells felt her right eye begin to
bleed.

Liddell then told Wells she would allow her the chance to
defend herself.  She instructed Wells to pick someone from the
group to fight.  Wells named Liddell, despite believing it would
not be a fair fight regardless of whom she chose.  Wells was
untied.  She swung at Liddell but missed.  She was immediately
hit in the back of the head.  After she fell to the ground, the
entire group began to hit and kick her.  She felt something cold
and hard hit her, like a hammer.  She also felt something hot cut
across her back and legs.  She believed she was "tased" on her
back and her feet.

Wells tried to cover her head and block the blows but began
to lose consciousness.  She lost consciousness after she was hit in
the jaw several times.  When Wells woke, it was dark.  She was
lying on her stomach with her feet tied to the pole and a towel
nearby.  Her hands were free.  She used the towel to wipe her
face because she was spitting up blood.  A female voice told Wells
to stop getting blood everywhere.  Wells covered her head with
the towel and went back to sleep.

*Day 5: August 28*

Wells woke the next morning in tremendous pain; she was
unable to talk or see very well due to her injuries.  Liddell gave

her permission to use the restroom.  Wells crawled most of the way to the restroom but when she attempted to use the wall to stand, Liddell told her not to get blood on the wall.  Wells saw herself in the bathroom mirror and began to cry.  Her eyes were "pretty much swollen shut" and her lips were "busted."  There was blood everywhere.  She attempted to wash the blood from her face, but Liddell ordered her out of the bathroom.  Cleveland and Liddell bound Wells to a chair in the bedroom.

Liddell told Wells she and Cleveland were leaving for a couple of hours, but warned, "Don't try no stupid shit."  She said her cousin was outside and Arnold would be back to check on Wells.

*The Escape*

Wells, fearing for her life, freed herself and crept down the stairs after they left.  When she saw no one in the apartment or outside, she ran for help.  Wells asked several people if she could use their phone, but was rebuffed because they did not want to be involved.  She ultimately ran into a television repair shop on West Boulevard where two men were inside.

To the men, Wells looked like "she was beat up something terrible."  She told the men someone was trying to kill her and asked to use the phone to call her mother.  The men refused, and said they were going to call 911 instead.  Wells said she did not want to get the police involved because she was afraid Liddell and the others would be able to track her down and hurt her further.  She "just wanted to get away."  The men called 911 when Wells collapsed and lost consciousness.

Paramedics observed that Wells's face was completely swollen and her eyes shut.  Wells told them she had been held captive for five days and kicked and hit repeatedly.  She asked

the paramedics to park the ambulance in the back of the store so Liddell and the others would not see it. Wells was transported to UCLA Medical Center, where medical staff treated her for multiple broken bones in her face, including her eye sockets and sinus area. She also suffered cuts to her face and legs, and had a first-degree burn on her shoulder. Wells reported she had been tased and tied up with extension cords and phone cords.

*The Criminal Proceedings*

Liddell, Cleveland, and Lewis were charged with torture (count 1; § 206); kidnapping (count 2 against Liddell and Cleveland only; § 207, subd. (a)); false imprisonment by violence (count 3; § 236); and assault with means likely to produce great bodily injury (count 4; § 245, subd. (a)(4)). As to all counts, the information further alleged that each defendant personally inflicted great bodily injury. (§ 12022.7, subd. (a).)

At trial, Wells testified to the events as described above. Wells also testified to the lasting effects of her ordeal, including numerous scars on her body, post-traumatic stress syndrome, impaired vision, migraines, and a cracked tooth. The People presented evidence corroborating Wells's account, including surveillance video from CVS, testimony from one of the men at the repair shop, and testimony about her injuries from staff at UCLA Medical Center.

The People also presented evidence from the police investigation. One of the detectives assigned to the matter testified that the West Boulevard apartment was completely empty when officers executed a search warrant there; it smelled of bleach and cleaning supplies. The pole in the living room had been removed, but there were corresponding plates still attached to the floor and the ceiling that indicated where the pole had

10

been. The officers recovered a bundle of extension cords near the front door, one of which had blood splattered on it. A BB gun made to look like a semi-automatic pistol was recovered from Arnold's apartment.

Liddell testified on her own behalf. She admitted she was with Wells all five days, but claimed she only used force against her on August 27, 2016, after Thomas ordered her to do so. Liddell testified she complied because she was afraid of Thomas and his friends. She admitted to beating Wells and using the electric cattle prod on her feet. She confirmed she, Cleveland, Arnold, and Marquis, Thomas's son, each punched, kicked, or cut Wells throughout the day. She further testified she never threatened Cleveland and was "shocked" when Cleveland cut Wells with a knife. She took the knife from Cleveland.

Liddell denied Wells was harmed or bound at the motel, or that anyone prevented her from leaving during that time. She testified Wells used methamphetamine at the motel, causing her to become jittery. She believed Wells accompanied them willingly to the motel and to the apartment on West Boulevard.

Liddell explained that during the time she and Cleveland stayed with Thomas at his home in Hemet, they discussed who could be behind the robbery and shooting. Thomas's friend, who she believed had just been released from jail, accused Liddell of orchestrating the robbery. He also demanded, "Bitch, you need to find out what happened . . . ." Because Thomas already suspected her, Liddell was afraid she would end up like Wells if she did not obey him.

Liddell testified Wells admitted that members of a Crip gang named Schoolyard were involved in the robbery and shooting. Liddell conveyed that information to Thomas's friend,

11

who had been calling for daily updates and threatening Liddell. Neither Cleveland nor Lewis testified at trial.

The jury found Cleveland guilty on all counts[2] and found true the great bodily injury allegations as to counts 2 through 4.[3] As to count 1 for torture, Cleveland was sentenced to a life term with minimum parole eligibility of seven years. She was also sentenced to a determinate term of five years for the kidnapping charge in count 2, with counts 3 and 4 to run concurrently and the sentencing enhancements stayed under section 654.[4] Cleveland timely appealed.

---

[2]    Liddell and Lewis were also found guilty on all counts. We affirmed the judgments against them in *People v. Liddell et al.* (Oct. 23, 2019, No. B292304) [nonpub opn.].

[3]    The trial court struck the great bodily injury enhancement allegation as to count 1.

[4]    The parties maintain, and we agree, the trial court improperly imposed and stayed the great bodily injury enhancements found true in counts 2 through 4. (§ 12022.7, subd. (a).)  Except in circumstances not applicable here, the trial court had no discretion to impose and stay the enhancements. (*People v. Haykel* (2002) 96 Cal.App.4th 146, 152.)  Rather, the court was required to either impose or strike the enhancements. (*People v. Bradley* (1998) 64 Cal.App.4th 386, 391; § 1385.)  The sentences on the great bodily injury enhancements are unauthorized.  (*People v. Vizcarra* (2015) 236 Cal.App.4th 422, 432.)  We decline to follow Cleveland's suggestion to strike the enhancements, however, as it is unclear from the record what the trial court would have done had it known it had such discretion. We thus remand the matter for the limited purpose of allowing the trial court to exercise its discretion to impose the enhancements under section 12022.7, subdivision (a), or to strike them.  (*People v. Solorzano* (2007) 153 Cal.App.4th 1026, 1041.)

## DISCUSSION

## I. The Trial Court Did Not Prejudicially Err When It Denied Cleveland's Duress Instruction

Cleveland contends the trial court prejudicially erred when it refused to instruct the jury on duress. Cleveland's defense at trial rested on her assertion she acted under duress because she feared she would be hurt by Liddell, Thomas, and the others if she did not comply with their instructions. According to Cleveland, she was just as much a victim as Wells, especially in the beginning when she was restrained and hit in the knees alongside Wells. Even after she was released, she witnessed the torture suffered by Wells and believed she would receive the same treatment if she did not do as she was told.

Contrary to Cleveland's assertions, however, there was no evidence of any direct or implied threat to her immediate safety. Moreover, there was no evidence of her state of mind to show she believed she was in imminent danger if she did not comply. As a result, the trial court did not err by refusing to instruct the jury on duress.

### A. Applicable Law

" 'It is well settled that a defendant has a right to have the trial court . . . give a jury instruction on any affirmative defense for which the record contains substantial evidence [citation]— evidence sufficient for a reasonable jury to find in favor of the defendant [citation]—unless the defense is inconsistent with the defendant's theory of the case [citation]. In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether "there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt . . . ." [Citations.]'

13

[Citations.]  On appeal, we likewise ask only whether the requested instruction was supported by substantial evidence . . . ."  (*People v. Mentch* (2008) 45 Cal.4th 274, 288.)

"Penal Code section 26 declares duress to be a perfect defense against criminal charges when the person charged 'committed the act or made the omission charged under threats or menaces sufficient to show that they had reasonable cause to and did believe their lives would be endangered if they refused.' " (*People v. Vieira* (2005) 35 Cal.4th 264, 289–290.)  "Duress is an effective defense only when the actor responds to an immediate and imminent danger.  '[A] fear of future harm to one's life does not relieve one of responsibility for the crimes he commits.' [Citations.]  The person being threatened has no time to formulate what is a reasonable and viable course of conduct nor to formulate criminal intent.  'The unlawful acts of the person under duress are attributed to the coercing party who supplies the requisite mens rea . . . .' [Citation.]  Thus, duress negates an element of the crime charged—the intent or capacity to commit the crime—and the defendant need raise only a reasonable doubt that he acted in the exercise of his free will.  [Citation.]"  (*People v. Heath* (1989) 207 Cal.App.3d 892, 900.)

## B.  Proceedings Below

At trial, Cleveland argued she had reasonable cause to believe she was in danger from Liddell, Thomas, and others if she did not comply with their instructions to restrain and harm Wells.  During opening statements, her counsel explained, "Ms. Cleveland didn't have the option to leave at any time.  She stayed there after she was beaten.  She stayed there after it was clear that someone was going to pay for what happened. . . .  Many things happened to Ms. Wells while she was there, but not at the hands of Ms. Cleveland, so much so that the only involvement

14

Ms. Cleveland had is doing exactly what she was told to do, at age 19, amongst some older people and some drug dealers. So when she was [told], hey, take [Wells] from here to here, help her from here to here, wash her up, she did what she was told."

Shortly before closing arguments, Cleveland's counsel requested the trial court instruct the jury with CALCRIM No. 3402,[5] the standard instruction on duress. The trial court was skeptical there was sufficient evidence to support an instruction on duress, noting the two hurdles to that instruction were immediacy and the seriousness of the threat. The trial court read section 26 strictly to apply only to fear of immediate death and found unpersuasive and nonbinding the cases that allowed a duress instruction where the evidence supported a finding of fear of great bodily injury. The court stated it saw no evidence anyone threatened Cleveland with immediate death.

---

[5] CALCRIM No. 3402 provides: "The defendant is not guilty of <insert crime[s]> if (he/she) acted under duress. The defendant acted under duress if, because of threat or menace, (he/she) believed that (his/her/ [or] someone else's) life would be in immediate danger if (he/she) refused a demand or request to commit the crime[s]. The demand or request may have been express or implied. The defendant's belief that (his/her/ [or] someone else's) life was in immediate danger must have been reasonable. When deciding whether the defendant's belief was reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in the same position as the defendant would have believed. A threat of future harm is not sufficient; the danger to life must have been immediate. [The People must prove beyond a reasonable doubt that the defendant did not act under duress. If the People have not met this burden, you must find the defendant not guilty of <insert crime[s]>.]"

Cleveland's trial counsel argued the totality of the evidence supported a duress instruction, including the initial hammer blows to her knees on the first night and the involvement of dangerous drug dealers and gang members who were out for revenge.[6] As a result, Cleveland could not leave and simply followed Liddell's instructions. He further explained, "in the midst of that my client . . . is broached with the question, 'Do you want some of this?' "

The trial court was unpersuaded. It indicated Wells herself did not believe she was at risk of immediate death in the days before she was beaten to unconsciousness, including when she was hit by a hammer, when she was tied up in Arnold's car, or when Liddell used a taser on her. According to the court, Wells "went through many, many times over what Ms. Cleveland went through, many, many times over, and she didn't say until very late in the game and on the phone with her mother and message to her son that death had even occurred to her." The court concluded, "So why would someone assume being hit with a hammer days before caused a lasting belief and fear that immediate death was about to occur if you didn't [get] cut with the knife, tase[d] with the taser, tie[d] [ ] up? So to me it is speculative to say that Ms. Cleveland at any point in time, let alone a time when she did the acts which would constitute these crimes personally, that she was in fear of immediate death."

---

[6] Cleveland also asserts she was raped by Arnold on the first night, lending further credence to her fear of Liddell, Arnold, and the others. Although there was testimony that Cleveland and Arnold had sex at the motel, there is no evidence that it was not consensual.

16

The trial court further found there was no evidence of Cleveland's state of mind and indicated she would likely have to testify about it if she wanted a duress instruction. After consulting with Cleveland, her counsel advised the trial court she was unwilling to testify because she feared Thomas and her codefendants. As an alternative, counsel requested an instruction that evidence of duress may negate the specific intent required for torture, even if the evidence failed to support a complete duress defense. This request, too, was denied.

After the verdicts, counsel filed a motion for new trial, asserting among other things, that denial of the duress instruction violated Cleveland's right to due process, a fair trial, and competent counsel. The motion for new trial was denied.

**C. There Was No Evidence of a Threat of Imminent Harm**

We agree with the trial court's finding there was insufficient evidence of duress to support a jury instruction on the defense. There was no evidence of a direct or implied threat to Cleveland, much less that the threat was of imminent great bodily injury or death. [7]

We are guided by the Supreme Court's analysis of similar facts in *People v. Powell* (2018) 6 Cal.5th 136, 164–165 (*Powell*). In *Powell*, the defendant claimed he acted under duress when he shot the victim during a robbery. The Supreme Court found the evidence did not support an inference of duress because there was no evidence the codefendants were armed at the crime scene, and

---

[7] For purposes of this opinion, we need not determine whether section 26 limits the defense of duress only to fear of immediate death and not to situations involving fear of great bodily injury. As discussed below, there was no evidence anyone threatened Cleveland with immediate death or great bodily injury.

the evidence showed the defendant did not claim in his police statement the codefendants threatened him in any way, only that he felt "pressured." Though the evidence showed the codefendants "coached" him to shoot the victim, the high court found "coaching is far from duress." (*Id*. at p. 165.) The court noted the version of events in the defendant's anticipated testimony included elements of duress. However, he elected not to testify and thus that testimony was not in the record. Accordingly, the court concluded the trial court did not err to refuse to instruct the jury on duress. (*Ibid*.)

In *People v. Otis* (1959) 174 Cal.App.2d 119 (*Otis*), Justice Tobriner, writing for the First District, also found an instruction on duress was not required. There, the defendant prison inmate was convicted of possession of three knives and a file. He testified another inmate stuck the point of a knife in him and told him that it was only a sample of what he would get if he did not hide the knives. (*Id*. at pp. 121–122.) The court found the threat of harm was not immediate. At the time of the threat, the inmate was in a different cell and the knife only pricked the defendant. The inmate was then moved to an entirely different part of the prison where he was murdered. The court found any threat of harm ended with the inmate's death. Moreover, "the threats themselves had stretched over a period from May to September, so that to some extent they became stale and partially remote" even before the inmate was killed. In any event, the defendant could have sought the protection of prison officials at any time but did not. (*Id*. at p. 126.)

The evidence here was likewise insufficient to require an instruction on duress. No one directly threatened Cleveland after the initial interrogation at the Moonlight Motel. Indeed, there was no evidence she was a suspect after the first day. To the contrary, Wells was asked whether Davis's phone call on the

18

fourth day increased Liddell's suspicions about Cleveland's involvement in the robbery. Wells responded, "No. She didn't do anything to Netta, didn't say anything to Netta. Still focused her attention on me. And that's when she put on the gloves and began to hit me, but she didn't threaten Netta or do anything towards her." Indeed, Cleveland was trusted to watch over Wells unsupervised.

Further, *Powell* informs us that Liddell's instructions to Cleveland to restrain and harm Wells were "far from duress." Although Cleveland claims she believed she was under threat of imminent harm, there was no evidence of her state of mind because she did not testify to it nor did anyone else testify she told them she feared for her life or safety.

Even if an implied threat could be inferred from the totality of the circumstances, *Otis* informs us that the threat of harm was not sufficiently imminent. Instead, any threat to Cleveland during the first night had become "stale and partially remote" in the intervening days. We agree with the trial court that the evidence did not support an inference that Cleveland faced an imminent threat of harm when Wells, who arguably was under far greater threat, did not feel harm to her was imminent until Day 4. When asked why she did not run to the police station on Day 3 after she had been restrained and hit in the knees by Liddell, Wells testified she did not "know that there was a real reason to run away." Additionally, as in *Otis,* Cleveland could have sought the protection of authorities but did not. We conclude the evidence failed to demonstrate an imminent threat of harm to Cleveland that necessitated an instruction on duress.

We likewise reject Cleveland's argument that the trial court erred when it refused to instruct the jury that evidence of duress may negate the specific intent required for torture, even if the evidence failed to support a complete duress defense. Under

appropriate circumstances, "a trial court may be required to give a requested jury instruction that pinpoints a defense theory of the case by, among other things, relating the reasonable doubt standard of proof to particular elements of the crime charged. [Citations.]  But a trial court need not give a pinpoint instruction if it is argumentative [citation], merely duplicates other instructions [citation], or is not supported by substantial evidence [citation]." (*People v. Bolden* (2002) 29 Cal.4th 515, 558.)  For the same reasons set forth above, the trial court was not required to give the pinpoint instruction requested by trial counsel because there was insufficient evidence to support it.

## II.    Joinder Was Proper

Cleveland next argues the trial court violated her constitutional rights when it declined to sever her trial from that of her codefendants'.  Cleveland argues severance was required because Liddell's defense was antagonistic to hers.  At trial, Liddell testified Cleveland attacked Wells with a knife on her own.  As a result, she claims, the prosecution's burden of proof to show Cleveland committed torture and assault was lightened while Cleveland's defense that she only acted upon Liddell's orders was weakened.  Cleveland also argues she feared Liddell to such an extent it prevented her from testifying during the joint trial, resulting in a violation of her due process rights.  We are not persuaded.

### A.  Governing Law

" 'Our Legislature has expressed a preference for joint trials.  [Citation.]  Section 1098 provides in pertinent part: "When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order[s] separate trials."  The court may, in its discretion, order separate trials if, among other reasons, there is an incriminating confession by one defendant

20

that implicates a codefendant, or if the defendants will present conflicting defenses . . . . [¶] We review a trial court's denial of a severance motion for abuse of discretion based on the facts as they appeared when the court ruled on the motion. [Citation.] If we conclude the trial court abused its discretion, reversal is required only if it is reasonably probable that the defendant would have obtained a more favorable result at a separate trial. [Citations.] If the court's joinder ruling was proper when it was made, however, we may reverse a judgment only on a showing that joinder " 'resulted in "gross unfairness" amounting to a denial of due process.' " [Citation.]' [Citation.]" (*People v. Homick* (2012) 55 Cal.4th 816, 848 (*Homick*); *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 150.)

"Severance is not required simply because one defendant in a joint trial points the finger of blame at another. ' " 'Rather, to obtain severance on the ground of conflicting defenses, it must be demonstrated that the conflict is so prejudicial that [the] defenses are irreconcilable, and the jury will unjustifiably infer that this conflict *alone* demonstrates that both are guilty.' " [Citation.] When, however, there exists sufficient independent evidence against the moving defendant, it is not the conflict alone that demonstrates his or her guilt, and antagonistic defenses do not compel severance.' [Citation.]" (*Homick, supra,* 55 Cal.4th at p. 850; see *People v. Letner and Tobin, supra*, 50 Cal.4th at p. 150.)

### B. The Trial Court Did Not Abuse Its Discretion in Denying the Motion to Sever

Because Cleveland and Liddell were charged with having committed common crimes that involved the same victim and the same series of events, the joinder of their cases was proper. (*Homick, supra,* 55 Cal.4th at p. 850.) Indeed, this scenario presents the "classic" case for joinder. (*People v. Letner and Tobin, supra,* 50 Cal.4th at p. 150.) The trial court did not abuse

21

its discretion when it denied Cleveland's severance motion before trial. Neither did its decision result in "gross unfairness" during the trial.

First, Cleveland's guilt was not shown solely by Liddell's attempt to cast blame on her. Independent evidence showed Cleveland was involved from the beginning and actively participated in the crimes against Wells. She was with Liddell at the time of the robbery and the subsequent attempt on Thomas's life. She accompanied Thomas and Liddell to Thomas's home in Hemet where Thomas and his friends demanded to know who orchestrated the plot against him. Liddell also testified Cleveland had an independent grievance against Wells because her friend assaulted Cleveland and Cleveland believed Wells could have stopped it.

Although Liddell suspected Cleveland was complicit with Wells on that first night at the motel, Cleveland was quickly cleared of suspicion and freed. For the next four days, Cleveland was left alone with Wells but failed to attempt to help Wells escape or leave the group herself. It is also undisputed she participated in restraining and beating Wells.

Aside from the independent evidence against her, Cleveland's argument that Liddell's antagonistic defense warrants severance is unavailing. Although Liddell testified she did not demand Cleveland attack Wells and was shocked when Cleveland brought out a knife to cut her, that testimony did not create an irreconcilable conflict such that the jury would unjustifiably infer the conflict alone demonstrated both defendants were guilty. (*People v. Hardy* (1992) 2 Cal.4th 86, 168.) " ' "That different defendants alleged to have been involved in the same transaction have conflicting versions of what took place, or the extent to which they participated in it, vel non, is a reason for rather than *against* a joint trial. If one is lying, it is

22

easier for the truth to be determined if all are required to be tried together." ' [Citations.]" (*People v. Morganti* (1996) 43 Cal.App.4th 643, 674–675.)  Here, Liddell's primary defense at trial centered on her fear that she would suffer the same fate as Wells if she did not obey Thomas's instructions.  No irreconcilable conflict was created because the jury could have accepted Liddell's defense without also convicting Cleveland.

Further, Cleveland was not deprived of her due process rights because she chose not to testify in a joint trial with Liddell. Cleveland presents no authority for the proposition that a defendant's own decision not to testify in a joint trial results in a due process violation.

Instead, Cleveland highlights a comment by the trial court when it denied the motion to sever prior to trial:  "There is circumstantial evidence that [Ms. Cleveland] was restrained and under duress.  You could make that argument without her even testifying."  Cleveland argues the trial court's subsequent refusal to instruct the jury on duress compromised her entire defense, resulting in "gross unfairness."  As we discussed above, the trial court's refusal to give a duress instruction was proper because there was insufficient evidence of a threat of immediate harm to Cleveland.  Moreover, Cleveland could have presented evidence of her state of mind through comments she made to other individuals.  She did not.  As a result, there was no evidence of her state of mind, whether by her own testimony or another witness's testimony.

## III.  Substantial Evidence Supports the Conviction for Torture

Cleveland next challenges her conviction for torture, arguing there was insufficient evidence of her specific intent to cause cruel or extreme pain and suffering to Wells for the purpose of revenge, extortion, persuasion, or for any sadistic

23

purpose as required by section 206.  We find substantial evidence supports the jury's finding.

### A.  Applicable Law

" 'In reviewing the sufficiency of the evidence, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." '  [Citation.]  'Substantial evidence' is evidence which is ' "reasonable in nature, credible, and of solid value." '  [Citation.]" (*People v. Morgan* (2007) 42 Cal.4th 593, 613–614.)

Under section 206, "[e]very person who, with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose, inflicts great bodily injury as defined in Section 12022.7 upon the person of another, is guilty of torture.  [¶]  The crime of torture does not require any proof that the victim suffered pain."

"Torture does not require the defendant act with premeditation and deliberation, and it does not require that he intend to inflict prolonged pain.  [Citation.]" (*People v. Massie* (2006) 142 Cal.App.4th 365, 371.)  "The intent with which a person acts is rarely susceptible of direct proof and usually must be inferred from facts and circumstances surrounding the offense. [Citations.]" (*Ibid.*)

### B.  Substantial Evidence Supported the Jury's Finding Cleveland Harbored the Requisite Intent

Cleveland asserts the evidence shows she acted under duress and lacked the specific intent necessary for the crime. We find the record contains substantial evidence of the requisite intent.  The evidence shows Cleveland helped Liddell restrain Wells and witnessed Liddell use a taser on and punch Wells over

24

four days. Cleveland also "admittedly" participated in harming Wells.

Wells testified Liddell did not tell Cleveland what to do or threaten Cleveland before she began to punch and kick her. Wells recalled Cleveland put on her shoes before the beating, indicating she gave thought to how she would harm Wells. For a "few minutes," Cleveland punched her head and kicked her in the back and side. Cleveland also participated in the group beating that occurred shortly after she and Lewis each took turns striking Wells. Wells was again tased, kicked, and punched until she lost consciousness.

"[T]he intent to cause severe pain need not be proven by direct evidence, but can be inferred from the circumstances of the offense, such as a focused attack on a particularly vulnerable area." (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1429.) In *Hamlin*, the court held substantial evidence supported a finding of an intent to commit torture where the defendant targeted the victim's face and areas of her body that he knew were already hurt. (*Id.* at p. 1428.) Likewise, Cleveland targeted Wells's face as well as the back of her head even after she witnessed Liddell punch her in the eye only hours before.

Additionally, substantial evidence supports a finding Cleveland harmed Wells for the purpose of revenge. Liddell testified Cleveland blamed Wells for the robbery. Liddell also testified Cleveland was angry at Wells because she was previously assaulted by one of Wells's friends and believed Wells should have stopped it.

We are not persuaded to change our conclusion by Cleveland's assertion she participated in torturing Wells because "she was afraid not to." That there may have been evidence of an

25

alternate or additional intent does not negate our finding that substantial evidence supports the jury's conclusion that Cleveland intended to inflict cruel or extreme pain and suffering. Neither does *People v. Pre* (1994) 117 Cal.App.4th 413 (*Pre*), alter our analysis. Cleveland cites *Pre* for the proposition that there must be "no other apparent purpose" for the crime other than "revenge or sadistic pleasure" for a torture conviction to stand. Cleveland turns *Pre* on its head. *Pre* does not stand for the proposition that the intent element of torture is not supported if there is *any* other apparent purpose for a defendant's actions. Again, evidence that an alternate or additional intent may exist does not negate our conclusion that substantial evidence supports a finding that Cleveland held the requisite intent for torture.

IV. **Section 654 Does Not Preclude Separate Sentences on Counts 2 through 4**

Cleveland contends her sentences on counts 2 through 4 should be stayed pursuant to section 654 because the offenses constituted an indivisible course of conduct with count 1 for torture and involved the same objective shared between her and Liddell: to extract information from Wells regarding the robbery and shooting. We disagree.

A trial court's section 654 determination is upheld if supported by substantial evidence. (*People v. Brents* (2012) 53 Cal.4th 599, 618; *People v. Coleman* (1989) 48 Cal.3d 112, 162.) If the court makes no express section 654 finding, a finding that the crimes were divisible and thus subject to multiple punishments is implicit in the judgment and must be upheld if supported by substantial evidence. (*People v. Lopez* (2011) 198 Cal.App.4th 698, 717.)

26

"Section 654 prohibits multiple punishment for a single physical act that violates different provisions of law." (*People v. Jones* (2012) 54 Cal.4th 350, 358.)  This prohibition extends to separate punishment for multiple crimes "committed during 'a course of conduct deemed to be indivisible . . . .' " (*People v. Harrison* (1989) 48 Cal.3d 321, 335); *People v. Islas* (2012) 210 Cal.App.4th 116, 129.)  Where the defendant has only a single intent and objective and all her offenses were incidental to that single intent and objective, she may be punished only once. (*People v. Britt* (2004) 32 Cal.4th 944, 951–952, disapproved on another ground in *People v. Correa* (2012) 54 Cal.4th 331.)

Alternatively, "a course of conduct divisible in time, although directed to one objective, may give rise to multiple violations and punishment." (*People v. Beamon* (1973) 8 Cal.3d 625, 639, fn. 11 (*Beamon*).)  "This is particularly so where the offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and to renew his or her intent before committing the next one, thereby aggravating the violation of public security or policy already undertaken." (*People v. Gaio* (2000) 81 Cal.App.4th 919, 935; *People v. Kwok* (1998) 63 Cal.App.4th 1236, 1255.)

In *In re William S.* (1989) 208 Cal.App.3d 313, 315-316 (*William S.)*, the defendant entered a home, stole several items, and left the front door unlocked when he departed.  He returned several hours later, entered through the unlocked door, took several more items, and again departed.  The defendant argued he committed only one burglary, but that even if he had committed two, he could be sentenced only once because leaving the door unlocked during the first entry evinced a single criminal

27

intent because it was done to facilitate the second entry. (*Id.* at pp. 318–319.)

The court rejected these arguments. It first distinguished the multiple entries in the case before it from a hypothetical case involving multiple entries within a short period of time in order to load a getaway vehicle. (*William S., supra,* 208 Cal.App.3d at p. 317.) The hypothetical scenario could be viewed as one continuous course of conduct and one crime. (*Ibid.*) But the case before it involved two entries made several hours apart, with ample opportunity for the defendant to reflect after the first entry, and therefore the two entries constituted two burglaries. (*Ibid.*) Additionally section 654 did not apply because the crimes were committed "by means of two distinct and different entries, separated both in time and place, and with the intent to steal entirely different property." (*Id.* at p. 319.) The court further noted "the grave risks of violent confrontation engendered in the initial burglary were repeated in the second," and that, "[t]he second entry doubled the danger of violent confrontation." (*Id.* at pp. 318–319.)

The court in *People v. Trotter* (1992) 7 Cal.App.4th 363 (*Trotter*) found section 654 did not apply even in a case where mere moments separated the crimes. There, the defendant shot three times in rapid succession at a pursuing officer as he led police on a high-speed car chase. (*Id.* at pp. 366–367.) On appeal, he argued he should not have been sentenced consecutively in two of the three assaults, arguing they were part of a single course of conduct and were incidental to one objective. (*Id.* at p. 366.)

28

The *Trotter* court rejected this contention, reasoning:

"The purpose behind section 654 is 'to insure that a defendant's punishment will be commensurate with his culpability. [Citation.]' [Citation.] Defendant's conduct became more egregious with each successive shot. Each shot posed a separate and distinct risk to [the pursuing officer] and nearby freeway drivers. To find section 654 applicable to these facts would violate the very purpose for the statute's existence. [¶] Furthermore, this was not a case where only one volitional act gave rise to multiple offenses. Each shot required a separate trigger pull. All three assaults were volitional and calculated, and were separated by periods of time during which reflection was possible. None was spontaneous or uncontrollable. '[D]efendant should . . . not be rewarded where, instead of taking advantage of an opportunity to walk away from the victim, he voluntarily resumed his . . . assaultive behavior.' " (*Trotter, supra*, 7 Cal.App.4th at pp. 367–368.)

As in *William S.* and *Trotter,* Cleveland's conduct was separated by periods of time during which Cleveland had the opportunity to reflect and walk away. The events occurred over five days. Aside from the first night, Cleveland was not restrained and had ample opportunity to reflect on the events as they occurred and leave. Indeed, she was left alone with Wells on the second day while Arnold and Liddell investigated the shooting. On the third day, she accompanied Wells to the restroom in a restaurant located across the street from a police station. Rather than take the opportunity to leave, she continued to aid Liddell to restrain Wells and move her from place to place. On the fourth day, Cleveland put on her shoes and began to punch and kick Wells upon Liddell's urging. She then watched

29

Lewis punch Wells to "bust the other eye" and still chose to participate in the group beating that ensued. She then remained at the West Boulevard apartment that night while Wells lay unconscious on the floor and only left with Liddell the next day.

We agree with *Trotter* that Cleveland should not be rewarded where, instead of taking advantage of multiple opportunities to walk away from the situation, she voluntarily participated in the offenses. (*Trotter, supra*, 7 Cal.App.4th at pp. 367–368.) We are not persuaded by *People v. Mejia* (2017) 9 Cal.App.5th 1036 (*Mejia*) to reach a different conclusion. Cleveland cites *Mejia* to argue section 654 applies where the underlying crimes were components of the course of conduct that constituted torture. *Mejia* did not address the Supreme Court's holding that a course of conduct divisible in time, although directed to one objective, may give rise to multiple violations and punishment where the defendant is afforded the opportunity to reflect and renew her intent. (*Beamon, supra,* 8 Cal.3d at p. 639, fn. 11.) *Mejia* does not invalidate *Beamon* or our analysis.

## DISPOSITION

The matter is remanded with directions to the trial court to exercise its discretion to impose or strike the great bodily injury enhancement under section 12022.7, subdivision (a), as to counts 2 through 4. The judgment is otherwise affirmed.


BIGELOW, P. J.

We concur:


GRIMES, J.          WILEY, J.

30